COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                      NO.
2-06-00254-CV

 

 

IN THE INTEREST OF C.S.C., A CHILD                                                    

 

                                              ------------

 

           FROM THE
323RD DISTRICT COURT OF TARRANT COUNTY

 

------------

 

MEMORANDUM OPINION[1]

 

------------

 

I. Introduction

Appellant Jennifer Thomas appeals the trial court=s order
terminating her parental rights to her daughter C.S.C.[2]  In her first two issues, Jennifer complains
that the evidence is legally and factually insufficient to support the trial
court=s
findings that termination was in C.S.C.=s best
interest and that she endangered the physical or emotional-well being of
C.S.C.  We will affirm.

 








II.  Factual and Procedural Background

A.     Events Prior to C.S.C.=s Birth

C.S.C. was immediately taken into the custody of
the Texas Department of Family and Protective Services (TDFPS) when she was
born on July 14, 2005.  Consequently, we
begin our recitation of the facts with events that occurred during Jennifer=s
pregnancy with C.S.C.  C.S.C.=s father
described Jennifer as having a bad temper and testified that while he and
Jennifer were living together, she pushed him and threw wood through windows at
their apartment because she was mad. 

Officer Howze of the Fort Worth Police Department
testified that on April 12, 2005, he investigated a domestic disturbance at
Jennifer=s
apartment.  He noted that almost every
window of the apartment had been broken out, that interior doors had been
damaged, and that a fire apparently had occurred when a pizza box was placed on
the stove.  Officer Howze=s
investigation revealed that Jennifer and her live-in boyfriend (C.S.C.=s
father) had argued.  Jennifer=s
boyfriend had pushed her, grabbed her around the neck, and then left the scene
when Jennifer called the police.  Jennifer
told Officer Howze that she had damaged the apartment=s
windows and doors because she became angry. Officer Howze reported that
Jennifer was thirteen at the time of this incident and that she was five months=
pregnant with her boyfriend=s child.









A few days later on April 15, 2005, Officer
William J. Bench of the Fort Worth Police Department encountered Jennifer in an
ambulance where she was being treated for cuts to her hand and arm.  Officer Bench learned that Jennifer had cut
her hand when she punched a window because she was mad.  While Officer Bench was with Jennifer, she
talked about killing her baby because she did not like it; she said that she
would rather kill her baby than let it Alive
like this@ and mentioned that she would Athrow it
in the trash can like the other B other
baby [she] had.@ 


Because of Jennifer=s age,
she could be released only to an adult. 
Officer Bench therefore contacted CPS, so CPS could become Jennifer=s legal
guardian, and took Jennifer to the hospital for a mental health
evaluation.  Officer Bench testified that
on the way to the hospital, Jennifer became Ahyper
violent@Ckicking
the windows, screaming, flailing her arms, and attacking anybody who opened the
squad car door, including himCand had
to be tied down in the back seat in order to be transported.  Officer Bench said that Jennifer had
acknowledged that she was pregnant but did not show any concern that her
violent actions might injure the child she was carrying.  








When they arrived at the hospital, Jennifer
refused an ob/gyn exam and denied being pregnant.  Jennifer again became Ahyper
violent@ in the
psychiatric ward and had to be restrained. 
Officer Bench described Jennifer as Auncooperative@ from
the very beginning of the investigation and Aangry at
her pregnancy.@   

That same evening, because Jennifer could not
provide the names of any adults willing to come pick her up, Lewis Thomas with
CPS began an investigation of the neglectful supervision of Jennifer.  Jennifer told Thomas that she had Adivorced
herself@ from
her parents and indicated that she was not going to cooperate with CPS.  Although Thomas attempted to get information
from Jennifer regarding where she might be placed, Jennifer was very
uncooperative.  Jennifer told Thomas that
she did not want to live in this life, that she did not want her baby, that she
did not want her baby to have any kind of life like this (i.e., living on the
streets), and that she ought to just throw her baby in a dumpster.  Thomas testified that Jennifer did not have
any interest in her child, that she had no concern for her prenatal health or
for the health of her child, and that she did not demonstrate an ability to
care for her child.  Thomas further
testified that Jennifer has bipolar disorder. 








Tara Bidwell testified that she works at TDFPS
and that it was her job to find a placement for Jennifer.  Bidwell found a facility for temporary
placement in Austin and transported Jennifer there in a rental car.  Bidwell testified that after they arrived at
the facility and were speaking with the caseworker, Jennifer said, A[S]hut
up, Bitch@ and hit the caseworker across
the face with a notebook.  Bidwell said
that Jennifer had an anger problem.

After hitting the caseworker, Jennifer went
outside where she proceeded to break the rear windshield wiper from the rental
car and used it to hit the car. Jennifer broke the windshield wipers on the
front of the rental car, the mirrors, and the tailgate light.  Jennifer then walked away from the facility,
and the facility called the Austin Police Department, who apprehended her.  Charges were filed against Jennifer, and then
she was transported to the hospital because she was complaining of cramps.  Bidwell testified that she did not find
Jennifer=s
behavior appropriate, especially for a person who would soon be responsible for
rearing a child. 

Jennifer gave birth to C.S.C. on July 14,
2005.  Jennifer was allowed to hold
C.S.C. for approximately thirty minutes. 
Afterwards, a TDFPS investigator, Kimberly Bailey, left with C.S.C. and
placed her with the Hewitts, who have a dual licensed foster home.  Bailey stated that before C.S.C. was born,
TDFPS made the decision that C.S.C. would be placed in foster care based on
Jennifer=s
behavior prior to C.S.C.=s birth.  Bailey explained that Jennifer, while
pregnant, had refused to eat, had hit herself in the stomach, and had made
comments about harming herself and the baby. 

 








B.     Events After C.S.C.=s Birth

After C.S.C. was born, CPS placed Jennifer in a
residential treatment center in Lubbock. 
Bailey testified that Jennifer was very physically aggressive, verbally
aggressive, assaultive, and suicidal. 
Bailey stated that Jennifer has bipolar disorder and conduct disorder. 

In September 2005, TDFPS placed C.S.C. with
Jennifer=s
aunt.  Before C.S.C. was placed with the
aunt, she was fine; when she was removed approximately two weeks later due to
allegations of neglect, C.S.C. had severe diaper rash, blistering to her
bottom, thrush, and weight loss.  TDFPS
returned C.S.C. to her original foster home, where she thrived. 

In November 2005, Detective Darrin McMichael
responded to a dispatch at Millwood Hospital, where Jennifer had been assigned
to undergo an evaluation.  Detective
McMichael reported that Jennifer had decided that she needed medication and
thought that the Millwood staff was not getting it for her quickly enough, so
she became very violent and had to be moved to another location where she was
more secluded.  There, Jennifer jumped
off the bed and attacked one of the hospital=s
technicians, Barbara Becker.  Jennifer
grabbed Becker=s hair and pulled out a large
clump, leaving a bald spot the size of a golf ball on the back of Becker=s
scalp.  Detective McMichael testified
that he pursued assault charges against Jennifer. 








Elizabeth Brook Knox testified that she is
employed by MHMR and Tarrant County Juvenile Services and that she was sent to
do a mental health screening on Jennifer. 
When Jennifer had arrived in juvenile detention, she had claimed that she
was having hallucinations.  Jennifer
later claimed that she was not having hallucinations but that she did intend to
harm herself and asked to be transported to the hospital.  Jennifer explained that she wanted to kill
herself, that she had tried to hang herself the day before, and that she would
try again if she was not taken to the hospital. 
But Jennifer then changed her explanation and said that she did not
really want to harm herself; instead, she just wanted to see her boyfriend,
whom she believed she would be able to see if she went to the hospital.  








During Knox=s
screening, Jennifer was initially calm and pleasant.  However, when Jennifer realized that she
would be required to wear a Agreen
suit@ at the
detention center, Jennifer asked Knox to call her CPS case worker.  Knox could tell that Jennifer, who was
handcuffed, was becoming agitated. 
Jennifer asked Knox to leave and said that she felt like she was going
to attack Knox.  But Knox was unable to
get out of the holding cell immediately and felt her hair being pulled hard
from behind.  Jennifer pulled Knox down
to the ground, and Knox knocked over a chair. 
Jennifer held Knox there until a staff member entered and
intervened.  Knox testified that she was
in fear for her life and that she had bruising and pain in her head for about a
week.  Knox further testified that
Jennifer is dangerous and that Jennifer did not show remorse for the
assault.  Thereafter, Jennifer was
adjudicated delinquent of assault and committed to the Texas Youth Commission
(TYC). 








Jason Kerr, who has been Jennifer=s
caseworker at TYC since March 21, 2006, testified that he monitors Jennifer=s
progress in the resocialization program. 
Kerr testified that Jennifer participates in academics, behavioral, and
correctional therapy and that she is in phase three in both academics and
behavioral therapy, with phase four being the highest level that she can
achieve.  Kerr said that Jennifer is on
phase one in correctional therapy; to get to phase two, she must present her
life story, and to get to phase three, she must go through the seven-step
process called the offense cycle.  He
stated that Jennifer=s primary goal is to be referred
to the WINGS program for mothers and children, but she must be a level three or
greater in all three therapies to get into the program.  Kerr testified that Jennifer has followed the
main rules of TYC; however, she has had some minor violations or Adisruption[s]
of program@Ctalking
without permission and not following staff instructionsCand a
major violationCthreatening a peer.  Kerr said that Jennifer has had no physical
altercations at TYC and that she has demonstrated the ability to control her
behavior since coming to his unit.  Kerr
stated that Jennifer is receiving treatment for anger management, but she is
not currently attending any parenting classes. 
He believes that Jennifer=s child
motivates her to change her behavior; however, on cross-examination, he
admitted that he has only known Jennifer for two months.  

C.     Compliance with Service Plan

Bailey testified that the service plan for
Jennifer required her to complete parenting classes and a psychological
evaluation, maintain appropriate housing, obtain employment, and maintain
regular contact with C.S.C.  Bailey testified
that Jennifer has begun or participated in parenting classes and that she has
completed the psychological evaluation. 
With regard to housing, Jennifer went from the initial placement in
Austin to detention, then to a shelter, then to a psychiatric hospital, and
then to a state hospital; from there she went to detention, and from there to
TYC, where she has been since January 2006. 
However, Bailey testified that Jennifer satisfied the requirement of
maintaining housing free of hazards by remaining in the custody of TDFPS.  Bailey stated that Jennifer does not have a
job and must demonstrate that she will be able to provide for C.S.C.=s
needs.  













Bailey said that Jennifer=s
contact with C.S.C. is limited, but that Jennifer has had two supervised
visits.  Bailey said that the initial
one-hour visit went fine and that Jennifer was very caring and very appropriate
with C.S.C.  However, during the second
visit, which lasted two hours, Jennifer did not appear to have a good
understanding of the things that a child C.S.C.=s age
was capable of doing.  Jennifer thought
that C.S.C., although only nine months old, should be able to walk and should
not be on formula.[3]  Thus, although Jennifer demonstrated an
interest in the well-being of C.S.C. and would call and ask her caseworker how
C.S.C. was doing, Jennifer has spent only three and a half hours total with
C.S.C. since the child=s birth.  Bailey testified that although TDFPS could
have done a monitored return of C.S.C., it chose not to because Jennifer=s mental
health care providers indicated that Jennifer=s
behavior was unpredictable. 
Consequently, TDFPS was unsure whether Jennifer would harm C.S.C.  Because Jennifer had not demonstrated any
ability to provide for the safety and needs of C.S.C. on a daily basis, had not
demonstrated an ability to provide a safe environment for C.S.C., and had not
demonstrated an ability to provide any type of financial support for C.S.C.=s daily
needs, it was Bailey=s testimony at trial that
Jennifer had not completed her service plan to TDFPS=s
satisfaction. 

Bailey testified that she would not say that
Jennifer=s
placements in hospitals and detention centers had affected her ability to
complete her service plan; instead, Bailey said that Jennifer has made choices
that have resulted in her not being able to complete her service plan.  For instance, Bailey stated that Jennifer had
engaged in assaultive behavior toward a number of people and had been both
physically and verbally aggressive.  Even
though Jennifer was concerned about C.S.C.=s
well-being, Jennifer was not able to manage her own behavior.  Thus, in Bailey=s
opinion, Jennifer=s behavior had gotten
worse.  

Based on Jennifer=s lack
of compliance with the service plan and her unpredictable anger issues, Bailey
stated that termination is in C.S.C.=s best
interest because Jennifer had continued to engage in behavior that is
endangering to C.S.C.  Bailey testified
that TDFPS=s plan for C.S.C. is adoption by
her foster parents.  Bailey said that
C.S.C. has been with her foster family, the Hewitts, since July 16, 2005 and
has bonded with the family.  Bailey
further testified that the Hewitts want to adopt C.S.C. and that Bailey feels
this is an ideal placement for C.S.C. 

 

 








D.     CASA Advocate=s
Recommendation

Penny Chandler, a CASA advocate for C.S.C.,
testified that C.S.C. is doing very well and is on target for her age and
development.  Based on her involvement
with the case, she recommended terminating Jennifer=s
parental rights.  She testified that
C.S.C. has bonded with her foster family and that the Hewitt family would be an
appropriate placement for C.S.C.  

E.     Disposition

After hearing the above evidence, the trial court
entered an order terminating Jennifer=s
parental rights.  This appeal followed.

III.  Burden of Proof and Standard of Review








In proceedings to terminate the parent‑child
relationship brought under section 161.001 of the family code, TDFPS must
establish one or more of the acts or omissions enumerated under subdivision (1)
of the statute and must also prove that termination is in the best interest of
the child.  Tex. Fam. Code Ann. ' 161.001
(Vernon Supp. 2006); In re J.L., 163 S.W.3d 79, 84 (Tex. 2005).  Both elements must be established; termination
may not be based solely on the best interest of the child as determined by the
trier of fact.  Tex. Dep't of Human
Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex. 1987).  Because of the elevated status of parental rights,
the quantum of proof required in a termination proceeding is elevated from the
preponderance of the evidence to clear and convincing evidence.  Santosky v. Kramer, 455 U.S. 745, 758‑59,
102 S. Ct. 1388, 1397 (1982); see also Tex.
Fam. Code Ann. ' 161.001.

The higher burden of proof in termination cases
alters the appellate standard for both legal and factual sufficiency
reviews.  In re J.F.C., 96 S.W.3d
256, 265 (Tex. 2002); In re C.H., 89 S.W.3d 17, 25 (Tex. 2002); In re
J.T.G., 121 S.W.3d 117, 124 (Tex. App.CFort
Worth 2003, no pet.).  Both legal and
factual sufficiency reviews in termination cases must take into consideration
whether the evidence is such that a fact-finder could reasonably form a firm
belief or conviction about the truth of the matter on which TDFPS bears the
burden of proof.  J.F.C., 96
S.W.3d at 265‑66; C.H., 89 S.W.3d at 25; J.T.G., 121 S.W.3d
at 124.  








Accordingly, in reviewing the evidence for legal
sufficiency in parental termination cases, we Alook at
all the evidence in the light most favorable to the finding to determine
whether a reasonable trier of fact could have formed a firm belief or
conviction that its finding was true.@  J.F.C., 96 S.W.3d at 266.  In conducting our review, we must disregard
all evidence that a reasonable trier of fact could have disbelieved; however, we
must consider undisputed evidence even if it does not support the finding.  Id. 
That is, we must consider evidence favorable to termination if a
reasonable fact-finder could, and disregard contrary evidence unless a
reasonable fact-finder could not.  City
of Keller v. Wilson, 168 S.W.3d 802, 827 (Tex. 2005).  If, after conducting our review, we determine
that no reasonable trier of fact could have formed a firm belief or conviction
that its finding was true, then we must conclude that the evidence is legally
insufficient.  J.F.C., 96 S.W.3d
at 266.

In determining a factual sufficiency issue, we
must give due consideration to evidence that the trier of fact could reasonably
have found to be clear and convincing and then determine whether, based on the
entire record, a fact-finder could reasonably form a firm conviction or belief
that the parent violated one of the provisions of section 161.001 and that the
termination of his or her parental rights would be in the child=s best
interest.  Tex. Fam. Code Ann. '
161.001; C.H., 89 S.W.3d at 25. 
In reviewing the factual sufficiency of the evidence, we must consider
all the evidence in the record, both that in support of and contrary to the
trial court=s findings.  C.H., 89 S.W.3d at 27‑29.
Additionally, we must consider whether disputed evidence is such that a
reasonable trier of fact could not have reconciled that disputed evidence in
favor of its finding.  J.F.C., 96
S.W.3d at 266.  If the disputed evidence
is of such magnitude that a trier of fact could not reasonably have formed a
firm belief or conviction that its finding was true, then the evidence is
factually insufficient.  Id. 

 








 

 

IV.  Legally and Factually Sufficient Evidence
Regarding Endangering Course of Conduct

 

In her second issue, Jennifer argues that the
evidence is legally and factually insufficient to establish the grounds for
termination under section 161.001(1)(E). 
TDFPS argues that there is ample evidence to support the trial court=s
endangerment finding based on Jennifer=s
conduct. 

Under section 161.001(1)(E), the relevant inquiry
is whether evidence exists that the endangerment of the child=s
physical or emotional well‑being was the direct result of the parent=s
conduct, including acts, omissions, or failures to act.  J.T.G., 121 S.W.3d at 125; see Tex. Fam. Code Ann. 

'
161.001(1)(E).  Endangerment means to
expose to loss or injury, to jeopardize. 
Boyd, 727 S.W.2d at 533; J.T.G., 121 S.W.3d at 125; see
also In re M.C., 917 S.W.2d 268, 269 (Tex. 1996).   Additionally, termination under section
161.001(1)(E) must be based on more than a single act or omission; a voluntary,
deliberate, and conscious course of conduct by the parent is required.  J.T.G., 121 S.W.3d at 125; see Tex. Fam. Code Ann. 

'
161.001(1)(E).  








However, it is not necessary that the parent=s
conduct be directed at the child or that the child actually suffer injury.  Boyd, 727 S.W.2d at 533; J.T.G., 121
S.W.3d at 125.  The specific danger to
the child=s well‑being may be
inferred from parental misconduct standing alone.  Boyd, 727 S.W.2d at 533; In re R.W.,
129 S.W.3d 732, 738 (Tex. App.CFort
Worth 2004, pet. denied).  To determine
whether termination is necessary, courts may look to parental conduct both
before and after the child=s
birth.  In re D.M., 58 S.W.3d 801,
812 (Tex. App.CFort Worth 2001, no pet.).

Stability and permanence are paramount in the
upbringing of a child.  See In re
T.D.C., 91 S.W.3d 865, 873 (Tex. App.CFort
Worth 2002, pet. denied).  A fact‑finder
may infer from past conduct endangering the well‑being of the child that
similar conduct will recur if the child is returned to the parent.  See In re D.L.N., 958 S.W.2d 934, 941
(Tex. App.CWaco 1997, pet. denied), disapproved
on other grounds by J.F.C., 96 S.W.3d at 256, and C.H., 89
S.W.3d at 17. 

The record demonstrates that Jennifer often
lacked emotional stability and that her behavior was unpredictable.  Jennifer has bipolar disorder and a conduct
disorder.  Consequently, Jennifer was
suicidal at times and had tried to hang herself after C.S.C. was born. 








The record reveals a pattern of uncontrolled
anger that often resulted in Jennifer inflicting physical harm upon herself,
both before and after she was pregnant, and others.  C.S.C.=s father
testified that Jennifer pushed him during an argument and that she had a bad
temper.  A few days later, Jennifer cut
her hand when she punched a window.  Also
during her pregnancy, Jennifer refused to eat, hit herself in the stomach, and
became Ahyper
violent@Ckicking
the windows, screaming, and flailing her armsCwhen she
was transported to the hospital. 
Jennifer was also the recipient of abuse from C.S.C.=s
father, her live-in boyfriend; he pushed her, grabbed her, and hit her while
she was pregnant.  

Concerning her conduct with regard to others,
Jennifer attacked the officers who opened the squad car door during one of her Ahyper
violent@
episodes.  Jennifer cursed at and hit her
caseworker in Austin with a notebook, threw a windshield wiper at the person
who transported her to Austin, attacked a medical technician and pulled out her
hair, and attacked and pulled to the ground the woman who was sent to perform a
mental health screening.  Moreover,
people who dealt with Jennifer described her as physically aggressive, verbally
aggressive, and assaultive. 








The record also reveals that Jennifer=s
uncontrolled anger often led her to damage property.  During one of her rages, Jennifer destroyed
an apartment by breaking all of the apartment=s
windows and damaging the apartment=s
interior doors.  During another rage,
Jennifer damaged a rental car by tearing off the rear windshield wiper and
breaking the front windshield wipers, the mirrors, and the tailgate light. 

The evidence also demonstrates that Jennifer made
threats about harming herself and her unborn child.  Specifically, Jennifer talked about killing
her baby because she did not like it and stated that she would Athrow it
in the trash can like the other B other
baby [she] had.@ 
Jennifer also said that she did not want to live in this life.  Jennifer threatened a peer while she was at
TYC and also mentioned that she wanted to spank C.S.C. for twisting and turning
her head while getting her nose wiped at nine months of age.  

Although Jennifer admits that her statements
about C.S.C. are alarming, she argues that there is no evidence that she
intended to act on any of these threats to harm C.S.C.  However, the evidence documented aboveCthat
Jennifer refused to eat, hit herself in the stomach, and engaged in assaultive
behavior towards others that could have endangered the babyC refutes
Jennifer=s
argument.








Jennifer also contends that because she never has
had custody of C.S.C., there is no evidence that she engaged in conduct which
directly endangered C.S.C.=s
physical or emotional well-being. 
However, endangering acts need not be directed at the child or cause
actual injury or threat of injury to the child, and as mentioned above,
endangerment may include what a parent does both before and after the birth of
a child.  In re U.P., 105 S.W.3d
222, 233-34 (Tex. App.CHouston [14th Dist.] 2003, pet.
denied); see also D.M., 58 S.W.3d at 812.

We have carefully reviewed the entire record.  Looking at all the evidence in the light most
favorable to the trial court=s
finding, giving due consideration to evidence that the fact-finder could
reasonably have found to be clear and convincing, we hold that a reasonable
trier of fact could have formed a firm belief or conviction that Jennifer
engaged in conduct that endangered C.S.C.=s
physical or emotional well‑being.  See
Tex. Fam. Code Ann. '
161.001(1)(E); In re S.F., 32 S.W.3d 318, 322 (Tex. App.CSan
Antonio 2000, no pet.) (holding that criminal behavior before child=s birth,
coupled with misbehavior during imprisonment, provided sufficient basis to
establish course of conduct that endangered child).  Accordingly, we hold that the evidence is
legally and factually sufficient to support the trial court=s
finding on endangerment.  We overrule
Jennifer=s second
issue.








Jennifer also challenges the legal and factual
sufficiency of two other statutory grounds for termination that were alleged by
TDFPS but not found by the trial court: 
that Jennifer constructively abandoned C.S.C. and that Jennifer executed
an unrevoked or irrevocable affidavit of relinquishment of parental
rights.  See Tex. Fam. Code Ann. '
161.001(1)(K), (N).  TDFPS concedes that
there is no evidence to support these two grounds.  Only one finding under section 161.001(1) is
necessary, however, to support a judgment of termination.  Tex.
Fam. Code Ann. ' 161.001(1); In re J.J.O.,
131 S.W.3d 618, 630 (Tex. App.CFort
Worth 2004, no pet.); see also Tex. Dep=t of
Human Servs. v. E.B., 802 S.W.2d 647, 649 (Tex. 1990) (op. on reh=g).  Accordingly, because we have held that
legally and factually sufficient evidence exists to support the trial court=s finding
under family code section 161.001(1)(E), we need not address Jennifer=s third
and fourth issues.  See Tex. Fam. Code Ann. '
161.001(1)(K), (N); Tex. R. App. P.
47.1; J.J.O., 131 S.W.3d at 630.

V.  Termination Was In C.S.C.=s Best
Interest

In her first issue, Jennifer argues that the
evidence is legally and factually insufficient to support the trial court=s
finding that termination of her parental rights was in C.S.C.=s best
interest.  TDFPS argues that there is
ample evidence to support the trial court=s Abest
interest@
finding. 








A strong presumption exists that the best
interest of a child is served by maintaining the custody of a parent.  In re W.E.C., 110 S.W.3d 231, 240
(Tex. App.CFort Worth 2003, no pet.).  The fact-finder may consider a number of
factors in determining the best interest of the child, including the
following:  (1) the desires of the child;
(2) the emotional and physical needs of the child now and in the future; (3)
the emotional and physical danger to the child now and in the future; (4) the
parental abilities of the individuals seeking custody; (5) the programs
available to assist these individuals to promote the best interest of the
child; (6) the plans for the child by these individuals or by the agency
seeking custody; (7) the stability of the home or proposed placement; (8) the
acts or omissions of the parent which may indicate that the existing parent‑child
relationship is not a proper one; and (9) any excuse for the acts or omissions
of the parent.  Holley v. Adams,
544 S.W.2d 367, 371‑72 (Tex. 1976). 
Some listed factors may be inapplicable to some cases; other factors not
on the list may also be considered when appropriate.  C.H., 89 S.W.3d at 27.

C.S.C. was only ten months old at the time of
trial and was unable to express her desires. 
However, testimony from Bailey and Chandler revealed that C.S.C. is
bonded with her foster family.  Mr.
Hewitt, C.S.C.=s foster father, testified that
C.S.C. does not know anyone other than the Hewitts as family.  Moreover, the record revealed that Jennifer
has spent a total of only three and a half hours with C.S.C. since her birth;
thus, C.S.C. is not bonded with Jennifer. 









The record did not reveal that C.S.C. had any
special physical and emotional needs. 
Instead, the evidence demonstrated that C.S.C. is doing very well and is
at least on target if not ahead of target for her age and development.  Mr. Hewitt testified that his family is
willing to continue to provide for C.S.C.=s
emotional and physical needs.

The endangering course of conduct discussion
above addressed the present and future physical and emotional dangers to
C.S.C., as well as Jennifer=s
parenting abilities, or lack thereof, and her acts and omissions.  Jennifer=s
unpredictable and often violent behavior resulted in physical harm to herself
and in her being adjudicated a juvenile delinquent for destruction of property
and assaults and threats against others. 
Although Jennifer argues that she was unable to complete her service
plan to TDFPS=s satisfaction because TDFPS Ashuttled
[her] from place to place with absolutely no continuity or stability,@  Jennifer=s own
actions caused her changes in living arrangements and caused her to be put in
hospitals and detention centers where she was unable to parent C.S.C. and was
unable to visit with C.S.C. very often. 
Moreover, the visits that Jennifer did have with C.S.C. showed that she
lacked knowledge of C.S.C.=s
development and that she lacked an understanding of what discipline, if any, is
appropriate in different circumstances. 
Therefore, TDFPS=s plan for C.S.C. included
terminating Jennifer=s parental rights and placing
her for adoption with her foster parents, which would provide a safe
environment and permanency.








Looking at all of the evidence in the light most
favorable to the best-interest finding, we hold that a reasonable trier of fact
could have formed a firm belief or conviction that its finding was true.  See J.F.C., 96 S.W.3d at 266; J.T.G.,
121 S.W.3d at 124‑25. 
Additionally, giving due consideration to evidence that the fact-finder
could have found to be clear and convincing, and based on our review of the
entire record, we hold that a reasonable trier of fact could have formed a firm
belief or conviction that the termination of Jennifer=s
parental rights would be in C.S.C.=s best
interest.  See In re S.M.L., 171
S.W.3d 472, 480 (Tex. App.CHouston
[14th Dist.] 2005, no pet.) (holding that clear and convincing evidence existed
that termination of father=s
parental rights was in child=s best
interest where, among other factors, father was incarcerated at time of
termination hearing and had a pattern of criminal and violent conduct).  Accordingly, we hold that the evidence is
legally and factually sufficient to support the trial court=s
best-interest finding.  We overrule
Jennifer=s first
issue.

VI.  Conclusion

Having overruled Jennifer=s first
and second issues, we affirm the trial court=s order
terminating Jennifer=s parental rights to C.S.C.

 

 

SUE WALKER

JUSTICE

 

PANEL F: 
CAYCE, C.J.; WALKER and MCCOY, JJ.

 

DELIVERED: 
November 30, 2006











[1]See Tex. R. App. P. 47.4.





[2]The trial court also
terminated the parental rights of C.S.C.=s father, but he did not appeal. 





[3]Paulette Owens-Flowers,
who is employed with CPS, observed this visit and testified that Jennifer let
go of nine-month-old C.S.C. to see if she could walk even though Jennifer had
been told that C.S.C. could not walk. 
Owens-Flowers also testified that Jennifer wanted to spank C.S.C. for
twisting and turning her head while getting her nose wiped.  Based on her observations, Owens-Flowers
stated that she does not feel that Jennifer has the ability to discipline or
train C.S.C.